**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 15 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

NORTH TEXAS PRODUCTION
CREDIT ASSOCIATION,

      Plaintiff-Appellant,

v.

MCCURTAIN COUNTY NATIONAL
BANK, DONALD WYRICK,
MILDRED FULLER, and HERSHEL
ROGERS,

      Defendants-Appellees.

No. 98-7076

NORTH TEXAS PRODUCTION
CREDIT ASSOCIATION,

      Plaintiff-Appellee,

v.

MCCURTAIN COUNTY NATIONAL
BANK,

      Defendant,

and

DONALD WYRICK, MILDRED
FULLER, and HERSHEL ROGERS,

      Defendants-Appellants.

No. 98-7140

NORTH TEXAS PRODUCTION

CREDIT ASSOCIATION,

       Plaintiff-Appellant,

v.

MCCURTAIN COUNTY NATIONAL
BANK,

       Defendant-Appellee,

and

DONALD WYRICK, MILDRED
FULLER, and HERSHEL ROGERS,

       Defendants.

No. 98-7175

---

Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 97-CV-567-S)

---

J. Mark Chevallier of McGuire, Craddock, Strother & Hale, Dallas, Texas (Scott B. Aston and James W. Ribman of Looper, Reed, Mark & McGraw, Inc., Dallas, Texas, with him on the briefs), for North Texas Production Credit Association.

James A. Belote of Stipe Law Firm, Oklahoma City, Oklahoma, for McCurtain County National Bank.

Alan V. Johnson (William F. Logan and Kyle J. Mead with him on the briefs) of Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C., Topeka, Kansas, for Donald Wyrick, Mildred Fuller, and Hershel Rogers.

---

Before **BALDOCK, EBEL** and **KELLY,** Circuit Judges.

---

EBEL, Circuit Judge.

Plaintiff-Appellant North Texas Production Credit Association ("NTPCA") filed suit against Defendants-Appellees McCurtain County National Bank ("MCNB") and individuals Donald Wyrick, Mildred Fuller, and Hershel Rogers[1] ("Wyrick," "Fuller," and "Rogers," collectively, the "Individuals;" the Individuals and MCNB referred to together as "Defendants") in United States District Court for the Eastern District of Oklahoma pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). Rowland and Loretha Clark (the "Clarks") engaged in series of loan transactions with both NTPCA and MCNB in connection with their cattle ranching business. The present litigation arose when the Clarks defaulted on a loan from NTPCA, and, as a result, NTPCA brought this action against Defendants. Generally, NTPCA sought to obtain the proceeds received by MCNB from the sale of some of the Clarks' cattle and it also alleged that Defendants conspired to commit fraud and, in fact, committed fraud against NTPCA.

The district court granted summary judgment for Defendants on all claims. MCNB and the Individuals separately sought attorney's fees pursuant to Okla. Stat. Ann. tit. 42, § 176. The district court granted attorney's fees to MCNB but denied attorney's fees for the Individuals. NTPCA appeals the order of the

---

[1]During the time the events relevant to case occurred, Wyrick was the President and CEO of MCNB, Fuller was Assistant Vice-President and, later, Vice-President at MCNB, and Rogers was the Senior Vice-President and Loan Officer.

- 3 -

district court granting summary judgment for Defendants (No. 98-7076) and also appeals the award of attorney's fees to MCNB (No. 98-7175). The Individuals appeal the order of the district court denying them attorney's fees (No. 98-7140). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM in part and REVERSE in part as to the grant of summary judgment for Defendants, VACATE the grant of attorney's fees to MCNB, and AFFIRM the denial of attorney's fees to the Individuals.

## BACKGROUND

Between 1989 and 1995, MCNB made a series of loans of approximately $200,000 each on a revolving basis to the Clarks in connection with the Clarks' cattle business.[2] MCNB filed a number of UCC-1 financing statements in connection with these loans in order to perfect its security interests in the collateral pledged by the Clarks.

NTPCA and the Clarks also had a lending relationship that dated back to 1989. As relevant to this appeal, on November 3, 1994, the Clarks executed and delivered to NTPCA a Variable Rate Promissory Note (the "Note") as part of a loan transaction wherein the Clarks agreed to pay NTPCA the principal sum of

---

[2]Because Defendants were the moving parties in the summary judgment that was granted, for purposes of this appeal we construe the facts most favorably to NTPCA.

$673,285 on or before October 15, 1995. The Clarks executed a security agreement in connection with the Note, pledging livestock as collateral.

Previously, on January 3, 1993, NTPCA had filed a UCC-1 financing statement in McCurtain County, Oklahoma (the "1993 Financing Statement"). The 1993 Financing Statement gave the following description of the collateral: "All livestock branded or unbranded or in the possession of debtor or hereafter acquired by way of replacement, substitution, increase or addition and/or inventory. All proceeds and products thereof. All crops, feed and feed inventory. All livestock to be purchased." Thus, the 1993 Financing Statement caused NTPCA's security interest in the cattle pledged as collateral for the Note to be perfected pursuant to Okla. Stat. Ann. tit. 12A, § 9-302.

The November 3, 1994 loan was to enable the Clarks to purchase 1,688 head of cattle for approximately $512,000 in a series of transactions with James Conley of Conley Cattle Co. ("Conley") between November 1994 and March 1995. NTPCA disbursed funds directly to Conley for the cattle purchases. MCNB, like NTPCA, also had a lending relationship with the Clarks.

In September and October 1995, Rowland Clark sold 1,090 head of cattle to Conley. Conley provided payment for the cattle in the form of three checks: one payable to Rowland Clark for $135,464.50 dated September 13, 1995; one jointly payable to Rowland Clark and MCNB for $205,856.43 dated October 4, 1995; and

one jointly payable to Rowland Clark and NTPCA for $111,000.94 dated October 4, 1995.

The Clarks did not repay the Note to NTPCA by October 15, 1995 and therefore went into default. On October 19, 1995, however, the Clarks paid $120,317.68 to NTPCA from the sale of the cattle to Conley. In order to recover the amount remaining due on the Note, NTPCA attempted to assert what it believed to be a first-priority interest in the remaining proceeds from the cattle Rowland Clark sold to Conley based on NTPCA's 1993 Financing Statement. MCNB, however, claimed it had first priority in the proceeds from the sale based on the UCC-1 financing statement that MCNB had filed in McCurtain County on September 20, 1991 (the "1991 Financing Statement"). The 1991 Financing Statement covered: "All livestock now owned or hereafter acquired, being of defferent [sic] sizes, sex, age and bred [sic], located in McCurtain County, Oklahoma."[3]

MCNB's 1991 Financing Statement cannot be found in the McCurtain County records available for public inspections. As evidence that the 1991 Financing Statement exists and remains in effect, MCNB provided a numerical copy of the 1991 Financing Statement. Apparently, when a financing statement is

_____

[3]MCNB filed a UCC-3 continuation statement pursuant to Okla. Stat. Ann. tit. 12A, § 9-403(3) on September 10, 1996 in order to extend the validity of the 1991 Financing Statement.

- 6 -

filed in McCurtain County, one copy is placed in an alphabetical index, which is accessible to the public for purposes of conducting lien searches, and one copy is placed in a numerical file located in the basement of the clerk's office. When a secured party terminates a financing statement, the alphabetical index copy in the public records is removed and returned to the secured party, but the duplicate numerical copy in the basement is not.

NTPCA disputed MCNB's asserted priority in the remaining proceeds from the Clarks' sale of the cattle to Conley and brought the present action seeking: (1) a declaratory judgment that it held a lien superior to the lien of MCNB on certain livestock owned by the Clarks; (2) judgment for all proceeds received by MCNB from the Clarks' sale of 1,090 head of cattle based on the theory that NTPCA held a purchase money security interest in the livestock; (3) avoidance of liens held by MCNB in connection with a loan made to the Clarks on November 2, 1995[4] on the theory that these liens were granted with the intent to hinder, delay or defraud NTPCA in violation of the Oklahoma Uniform Transfer Act, Okla. Stat. Ann. tit. 24, §§ 112-23  In the alternative to counts (2) and (3), NTPCA sought an equitable lien on the proceeds from the sale of the Clarks' livestock. NTPCA also sought damages on the ground that the Clarks, the Individuals, and MCNB

---

[4]On November 2, 1995, MCNB and the Clarks entered into a new loan agreement for $200,000. In connection with the loan, the Clarks granted MCNB a security interest in cattle, real estate, and equipment.

engaged in a civil conspiracy to defraud NTPCA, and in fact defrauded NTPCA. NTPCA sought punitive damages in connection with the fraud and conspiracy claims. Finally, NTPCA sought to preclude MCNB from enforcing its priority position pursuant to the 1991 Financing Statement under waiver and estoppel theories. As noted above, the district court granted summary judgment to Defendants on all claims, and NTPCA now appeals.

## DISCUSSION

### I.    Order Granting Summary Judgment for Defendants

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S.Ct. 53 (1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms, 165 F.3d at 1326.

**A.     NTPCA's Lien Priority Claim**

NTPCA argues that the district court erred in granting summary judgment for MCNB on its claim that it has priority in the proceeds[5] from the Clarks' sale of their cattle to Conley. NTPCA puts forth a number of different legal theories in support of this claim. We hold that the district court erred in granting summary judgment against NTPCA on the lien priority claim, but only as to one of the theories asserted by NTPCA.

**1.     Termination of 1991 Financing Statement**

NTPCA first urges that the district court erred in rejecting NTPCA's claim that it has priority in the proceeds received by MCNB from the sale of the 1,090 head of cattle based on the theory that MCNB terminated the 1991 Financing Statement.[6] NTPCA can provide no direct evidence to show that MCNB terminated the 1991 Financing Statement. In an effort to show that MCNB terminated the statement, NTPCA emphasizes that (1) the 1991 Financing

---

[5]Under the UCC, "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof . . . and also continues in any identifiable proceeds including collections received by the debtor." See Okla. Stat. Ann. tit. 12A, § 9-306(2).

[6]Should NTPCA be able to prove that MCNB terminated the 1991 Financing Statement, it appears that NTPCA would have priority in all of the Clarks' cattle sold to Conley based on its 1993 Financing Statement, and would be entitled to recover the proceeds MCNB received from the sale of the cattle to Conley. See Okla. Stat. Ann. tit. 12A, § 9-312 (establishing priorities among conflicting security interests in collateral).

Statement was missing from the public record and (2) MCNB engaged in a pattern of filing and releasing financing statements. NTPCA asserts that, based on this evidence, a genuine issue of material facts exists as to whether MCNB also terminated the 1991 Financing Statement. We agree.

The record reflects that NTPCA searched the McCurtain County records for liens against or other security interests in the Clarks' assets on December 9, 1992, March 10, 1993, November 1, 1994, and October 20, 1995. NTPCA never located a copy of the 1991 Financing Statement during these searches. Moreover, NTPCA requested the McCurtain County Clerk to conduct a certified lien search on November 3, 1995. Apparently, this lien search did not reveal the existence of the 1991 Financing Statement either.

The fact that the financing statement was missing from the record, alone, would not be sufficient to put NTPCA into a position of first priority. Under the UCC, the presentation for filing of a financing statement and tender of the filing fee or acceptance of the statement by the filing officer constitutes proper filing. See Okla. Stat. Ann. tit. 12A, § 9-403(1). In addition, a secured party does not bear the risk of improper filing or indexing as long as its conduct does not lead to the error on the part of the filing officer. See Okla. Stat. Ann. tit. 12A, § 9-407 cmt.1; McMillin v. First Nat'l Bank & Trust Co., 407 F. Supp. 799, 803 (W.D.

Okla. 1975); Liberty Nat'l Bank & Trust Co. v. Garcia, 686 P.2d 303, 306 (Okla. Ct. App. 1984).

NTPCA argues, however, that the present situation can be distinguished from these cases, because MCNB engaged in a practice of filing and later terminating financing statements. NTPCA argues that a fact finder could infer that the 1991 Financing Statement was terminated like a number of other financing statements filed by MCNB with the McCurtain County Clerk in connection with loans made to the Clarks. NTPCA provides evidence to show that MCNB filed UCC-1 financing statements on: September 28, 1989; July 2, 1990; October 22, 1990; March 28, 1991; September 20, 1991; June 23, 1992; December 15, 1992; December 15, 1994; and November 12, 1995.

Moreover, NTPCA provides evidence that six of these eight financing statements were terminated by MCNB.[7] Wyrick testified during his deposition that on September 26, 1990, MCNB terminated the financing statements filed on September 28, 1989 and July 2, 1990. In addition, the record includes copies of the October 22, 1990 financing statement and the March 28, 1991 financing

_____

[7]A party may file a termination statement in order to terminate a financing statement. NTPCA cannot provide copies of the termination statements to prove that MCNB's financing statements were terminated, however. Karen Conaway, the McCurtain County Clerk, stated in her affidavit that "a substantial portion of the termination statements maintained by the Clerk's office in the basement of the Courthouse [have] either been destroyed, misplaced or thrown away."

statement which each bear the handwritten statement "Released 9-11-91."[8]

NTPCA has also produced a copy of the June 23, 1992 financing statement

bearing a stamp from the County Clerk's office stating "Released December 3,

1992" and a copy of the December 15, 1994 financing statement bearing a stamp

from the County Clerk's office stating "Released March 12, 1993."[9]

The record also includes evidence describing the practice of the McCurtain

County Clerk's office when terminating UCC-1 financing statements. Karen

Conaway, the McCurtain County Clerk, stated in a sworn affidavit that

"[w]henever a termination statement or release of lien is presented to the Clerk's

Office, the Clerk removes the original filing maintained in the public records,

stamps it released and returns it to the secured party." Based on this explanation

of the procedures used by the McCurtain County Clerk's office, a fact finder

could conclude that the financing statements bearing the "released" notation had

been terminated by MCNB.[10]

---

[8]Citing Gross v. Burggraf Construction Co., 53 F.3d 1531, 1541 (10th Cir. 1995), MCNB asserts that the copies of these financing statements bearing the release notations are inadmissible hearsay. MCNB waived any objection to these documents, however, by submitting copies of them in support of its own motion for summary judgment.

[9]NTPCA apparently discovered this financing statement during a spot-check at the McCurtain County Clerk's office. NTPCA asked Rowland Clark to have MCNB release the financing statement.

[10]MCNB argues that there is insufficient evidence to show that the October
(continued...)

We also believe a fact finder could conclude that MCNB terminated the 1991 Financing Statement because it wished to hide its lending relationship with the Clarks and its related security interests in the Clarks' livestock. A fact finder could draw this inference from evidence suggesting that MCNB terminated a number of its other financing statements in order to prevent NTPCA from detecting its security interests in the Clarks' cattle. NTPCA conducted regular inspections of the McCurtain County records in order to ensure the absence of any other liens which could impair NTPCA's collateral. Apparently, NTPCA almost

---

[10](...continued)
20, 1990 and March 28, 1991 financing statements were terminated because these only bear the handwritten notation indicating that the lien had been released. Even though the county clerk's affidavit indicates that the clerk's office would "stamp" a financing statement as being released, we find Conaway's affidavit provides a sufficient basis to create a genuine issue of material fact as to whether these financing statements had been terminated.

MCNB also urges that it is impossible that the 1991 Financing Statement was terminated because MCNB still has a copy of the original termination statement, which would be sent to the Clerk's office in order to request that the lien be terminated. While the fact that MCNB still had the original termination statement in its files may be some evidence that the 1991 Financing Statement was never terminated, this fact alone would not preclude the conclusion that MCNB had terminated the 1991 Financing Statement because the record reflects that there were other ways in which a financing statement could be terminated. In particular, Deputy McCurtain County Clerk Linda Sanders testified in her deposition that the clerk's office would accept oral termination requests over the telephone. Aplt. App. Vol. IV at 593. Although this practice appears to conflict with the formal requirements of Okla. Stat. tit. 12A, § 9-404 (requiring written, signed statement which shall be noted "in the index"), it is sufficient evidence to defeat summary judgment.

- 13 -

always gave Rowland Clark advance notice of its intention to inspect the McCurtain County records a few days before it did so. On three occasions, MCNB's decision to terminate financing statements preceded NTPCA's lien searches by a few days. Specifically, MCNB terminated two financing statements on September 26, 1990–the day before NTPCA performed a search of the liens on file at McCurtain County. Similarly, MCNB terminated two other financing statements on September 11, 1991, which was one day before NTPCA inspected the county records. Finally, MCNB allegedly terminated the June 23, 1992 financing statement just six days before NTPCA inspected the McCurtain County records on December 9, 1992.

We further note that a fact finder could also find it significant that MCNB terminated its financing statements despite the fact there was a substantial amount remaining due on MCNB's loans to the Clarks that were associated with these liens.[11] When MCNB terminated the financing statements filed on September 28, 1989 and July 2, 1990, the Clarks still owed MCNB $193,931.31. Similarly, when MCNB allegedly terminated the October 22, 1990 and March 28, 1991 financing statements, the Clarks owed $199,677.96 to MCNB. Finally, the Clarks owed MCNB $199,536.24 when MCNB allegedly terminated the filing statements filed on June 23, 1992 and December 15, 1992. This evidence tends to support

---

[11]Apparently, this practice conflicted with the MCNB's normal policies.

the conclusion that the financing statements were released for the purposes of hiding the lending relationship, rather than because the Clarks had repaid their loans to MCNB.

We find NTPCA's evidence supporting the conclusion that MCNB engaged in a practice of terminating UCC-1 financing statements in order to preclude detection of its lending relationship with Rowland Clark by NTPCA is sufficient to create a genuine issue of material fact as to whether MCNB also terminated the 1991 Financing Statement. We therefore conclude that the district court erred in granting summary judgment for MCNB on NTPCA's lien priority claim.

### 2. Priority in Cattle from Texas

NTPCA also claims that, even if MCNB's 1991 Financing Statement is valid and gives MCNB first priority in some of the cattle the Clarks sold to Conley, NTPCA nonetheless has priority over MCNB in the proceeds from the sale of at least 600 of the cattle because those cattle were located in Texas at the time of the sale.[12] NTPCA bases this argument on the fact that its 1993 Financing Statement covered all cattle owned by the Clarks whereas MCNB's 1991 Financing Statement only covered the Clarks' cattle located in McCurtain County.

---

[12]Boyd Harvey, who helped Rowland Clark load the cattle for sale, stated in a sworn affidavit that approximately 600 head of cattle came from the Clarks' ranch in Texas, while the remaining cattle came from the Clarks' property in McCurtain County.

We hold that the district court did not err in granting summary judgment to MCNB on this claim.

As noted above, the record reflects that Conley purchased 1,090 steers from Rowland Clark in September 1995 and October 1995, and that Conley provided payment for the steers in the form of three checks: one to Rowland Clark individually for $135,464.50; one to Rowland Clark and MCNB for $205,856.43; and one to Rowland Clark and NTPCA for $111,000.94. Based on these checks, however, NTPCA cannot show that MCNB received proceeds from the sale of the 600 Texas cattle. Although the September 13 check to Rowland Clark bears a notation indicating that the check is payment for 308 steers, neither of the other two checks indicate the number of cattle sold to Conley with respect to those sales. There is no evidence that the proceeds from the sale of the Texas cattle went to MCNB or that those proceeds did not go to Rowland Clark and NTPCA.[13]

_____

[13]NTPCA has put forth evidence indicating that Conley resold the same 1,090 head of cattle he purchased from Rowland Clark to the Midwest Cattle Company of Arizona in three lots. These transactions are reflected by three receipts from Conley Cattle Company: one dated September 8, 1995, indicating Midwest paid Conley $135,464.50 for 308 steers; one dated September 21, 1995, indicating Midwest paid Conley $102,174.47 for 240 steers; and one dated September 29, 1995, indicating Midwest paid Conley $240,089.45 for 542 steers. Although the sale of 308 steers to Midwest could be correlated to the check Conley wrote to Rowland Clark for 308 steers, the same cannot be said for the other transactions with Midwest and the checks payable to Clark/NTPCA and Clark/MCNB. Thus, we cannot determine the number of cattle for which Clark/NTPCA and Clark/MCNB received payment based on the sales from Conley
(continued...)

Because NTPCA has failed to produce any evidence indicating that MCNB received proceeds from the sale of the Texas cattle, we cannot conclude that the district court erred in granting summary judgment for MCNB on this theory.

### 3. Priority Based on PMSI

NTPCA further argues that it has priority in the cattle sold to Conley based on the fact that it held a PMSI in the 1,688 head of cattle that the Clarks purchased through their loan from NTPCA. NTPCA alleges that the cattle sold to Conley were one and the same as those in which it held a PMSI. A party holds a PMSI in collateral if the security interest is "taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." Okla. Stat. Ann. tit. 12A, § 9-107. A perfected purchase money security interest generally takes priority over other perfected security interests. See Okla. Stat. Ann. tit. 12A, § 9-312. Thus, NTPCA argues that, even if MCNB's 1991 Financing Statement is valid, it has a right to the proceeds of the sale to the extent that the Clarks sold cattle to Conley in which NTPCA held a PMSI.

Even assuming NTPCA did, in fact, have a PMSI in the cattle purchased with proceeds from its loan to the Clarks, we would nonetheless find that this

---

[13](...continued)
to Midwest.

argument does not warrant reversal because NTPCA cannot show that MCNB received proceeds from the sale of cattle in which it held a PMSI. NTPCA attempts to demonstrate that the cattle in which it had a PMSI were the same cattle the Clarks sold to Conley based on the average weight of the cattle purchased, sold, and owned by the Clarks at various points in time. It is impossible, however, for NTPCA to correlate the cattle sold to Conley with the cattle originally purchased by the Clarks based on average weight.[14] This is because evidence of the average weight of the cattle owned by the Clarks at any given point in time in no way shows that those cattle were one and the same as those in which NTPCA held a PMSI.[15]

In addition, there is undisputed evidence in the record that NTPCA had no way of knowing whether the 1,090 head of cattle sold to Conley in September and

---

[14]NTPCA provides no evidence concerning the brand, breed, or age of the cattle in which it held a PMSI.

[15]MCNB asserts that the district court concluded that it had a PMSI in 352 of the cattle sold to Conley. MCNB argues that it was entitled to the proceeds from the sale of 352 of the 1,090 head of cattle sold to Conley by virtue of the PMSI. Apparently, on June 14, 1994, MCNB issued a loan advance to the Clarks in the amount of $154, 936.32. On that same day, Rowland Clark wrote a personal check to Conley for $149,427.50, noting that the check was for the purchase of 352 steers. Our review of the district court order indicates that, contrary to MCNB's assertion, the district court never resolved whether the MCNB had a PMSI in these 352 head of cattle or whether these 352 head of cattle were ever sold to Conley as part of the 1,090 head sold in September and October 1995. We believe these questions are more properly a matter for the district court to resolve in the first instance, and we therefore decline to resolve them on appeal.

October 1995 were the cattle in which NTPCA held a PMSI. Thomas Welch, Vice President of NTPCA and loan officer for the Clarks, stated during his deposition that, aside from 202 head of cattle sold to a Texas feed lot, Welch had no idea when or to whom the Clarks sold the remaining 1,486 head of cattle in which it held a PMSI. This evidence, coupled with the fact that no inferences may be drawn from the evidence of average weight offered by NTPCA, we conclude that the NTPCA has not shown that a genuine issue of material fact exists as to whether the cattle in which it held a PMSI were sold to Conley.[16]

### 4. Waiver/Estoppel

NTPCA also asserts that the district court erred in granting summary judgment for MCNB on its waiver and estoppel theories. These arguments are without merit, and we therefore find no error on the part of the district court.

NTPCA argues that, even assuming MCNB did not terminate the 1991 Financing Statement, MCNB should be barred from asserting its priority because

---

[16]NTPCA argues that "simple math" establishes that the cattle sold to Conley must have been cattle in which NTPCA held a PMSI. This argument is raised for the first time in the reply brief and therefore will not be considered by this court. See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 724 (10th Cir. 1993). In any event, we would find that NTPCA's argument is without merit. NTPCA suggests that a fact finder could infer that NTPCA held a PMSI in the cattle sold to Conley based on "the relative number of cattle bought with each lender's funds" and using a "basic first in first out logic." This argument presumes that the Clarks sold their cattle in a particular order; a proposition for which there is no support in the record.

MCNB waived its first-priority status. NTPCA asserts that MCNB knowingly relinquished its rights in the 1991 Financing Statement by engaging in a pattern of filing and then subsequently terminating financing statements filed after that time. Although it is true that a party may waive a known right by expressing an intention to relinquish that right, see Yates v. American Republics Corp., 163 F.2d 178, 179 (10th Cir. 1947), the fact that MCNB terminated financing statements filed after September 1991, in no way indicates that MCNB intended to relinquish its priority status as established by the 1991 Financing Statement. Indeed, MCNB's willingness to terminate later financing statements could support exactly the opposite conclusion–that MCNB believed the 1991 Financing Statement continued to assure its priority status.

NTPCA also urges that MCNB should be equitably estopped from relying on the 1991 Financing Statement. In order to succeed in this claim, NTPCA must show:

> (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury.

Penny v. Giuffrida, 897 F.2d 1543, 1545-46 (10th Cir. 1990). NTPCA reasons that MCNB should be estopped from asserting its priority status in light of

NTPCA's reliance on MCNB's release of the December 15, 1992 financing statement on March 12, 1993.

The record reflects that, on March 10, 1993, NTPCA conducted a "spot check" of the McCurtain County records. NTPCA discovered MCNB's financing statement of December 15, 1992 that day. NTPCA apparently asked Rowland Clark about the financing statement, and Rowland Clark told NTPCA that the financing statement was filed in connection with a loan that he had co-signed for his son. Rowland Clark also told NTPCA he would have MCNB release the financing statement, which MCNB did on March 12, 1993. Based on these facts alone, NTPCA cannot show that MCNB ever intended NTPCA to believe that it had no security interests in the Clarks' livestock once it released the December 12,1995 financing statement. This evidence does not preclude the possibility that MCNB fully intended to enforce its rights with respect to the 1991 Financing Statement even though it was willing to release the December 12, 1992 financing statement. We therefore conclude that the district court properly granted summary judgment to MCNB on the equitable estoppel claim.

### 5. MCNB's Affirmative Defense

MCNB asserts that, regardless of any party's priority interests in the cattle, it is entitled to retain all proceeds received from the sale of the cattle to Conley because it was a transferee in the ordinary course of business. Comment 2(c) to

Okla. Stat. Ann. tit. 12A, § 9-306 provides that "[w]here cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds." The Oklahoma Supreme Court has interpreted this comment to require that the transferee have acted in good faith and without knowledge of the other party's security interest in order to obtain the benefit of the affirmative defense. See Anderson, Clayton & Co. v. First Am. Bank, 614 P.2d 1091, 1094-95 (Okla. 1980).

The district court did not address this claim in its order granting summary judgment for the defendants, and we decline to consider it on appeal. As a general rule, we do not consider issues not passed on below, and it is appropriate to remand the case to the district court to address an issue first. See R. Eric Peterson Constr. Co. v. Quintek, Inc., 951 F.2d 1175, 1182 (10th Cir. 1991). This rule is particularly applicable in the present case given that the determination of whether MCNB acted in good faith and without notice of NTPCA's security interest are factual inquiries that are best resolved in the first instance by the district court. Moreover, the question of whether MCNB is entitled to assert this defense is necessarily intertwined with the resolution of the conspiracy and fraud claims in this case. Comment 2(c) to § 9-306 emphasizes:

> What has been said [concerning the affirmative defense available to a recipient of proceeds] relates to payments and transfers in ordinary

- 22 -

course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

Given our conclusions at Parts I.B. and I.C., infra, that it is necessary to remand the fraud and conspiracy claims to the district court, it would be inappropriate for this court to determine if MCNB is entitled to retain the proceeds of the cattle sale as a transferee in the ordinary course.

**B.     Fraud**

NTPCA alleges that the district court erred in finding that NTPCA had failed to show that there was a genuine issue of material fact as to the existence of these elements. We agree, and reverse the judgment of the district court with respect to this claim.

**1.     Evidentiary Ruling**

As an initial matter, we address NTPCA's claim that the trial court improperly excluded the evidence that Rowland Clark invoked his Fifth Amendment privilege against self-incrimination when asked during his deposition about his relationship with MCNB and the Individuals. NTPCA apparently wished to use Rowland Clark's invocation of the Fifth Amendment as evidence of fraud against MCNB and the Individuals. The district court excluded this evidence from consideration on summary judgment by granting the Individuals' motion in limine to exclude the testimony of Rowland Clark on the grounds that it

- 23 -

was more prejudicial than probative. The district court granted a similar motion filed by MCNB.

We review a trial court's evidentiary rulings on summary judgment under an abuse of discretion standard. See Nielsen v. Moroni Feed Co., 162 F.3d 604, 606 n.3 (10th Cir. 1998). NTPCA did not include the trial court's orders excluding this evidence as part of the record on appeal. Without these orders, it is impossible for this court to review the trial court's reasoning to determine if there was an abuse of discretion. See McEwen v. City of Norman, 926 F.2d 1539, 1550 (10th Cir. 1991) (finding that an appellant's failure to designate the relevant record requires this court to find that the appellant has not met his burden of proving that the trial court's ruling was an abuse of discretion). We therefore decline to reverse the district court's decision to exclude this evidence.

### 2. Summary Judgment

The Oklahoma Supreme Court has explained that a plaintiff must show the following in order to succeed in a claim of fraud under Oklahoma law:

> To constitute actionable fraud, it must be made to appear: (1) That defendant made a material representation; (2) that it was false; (3) that he made it when he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; (6) that he thereby suffered injury; and (7) that all these facts must be proven with a reasonable degree of certainty, and all of them must be found to exist, the absence of any of them would be fatal to a recovery.

Ramsey v. Fowler, 308 P.2d 654, 656 (Okla. 1957) (citation and quotations omitted). Under Oklahoma law, these elements must be found by clear and convincing evidence in order for a fact finder to find fraud on the part of the defendant. See Brown v. Founders Bank & Trust Co., 890 P.2d 855, 862 n.17 (Okla. 1995); Steiger v. Commerce Acceptance, 455 P.2d 81, 88 (Okla. 1969). Consistent with this requirement, NTPCA alleges that the Individuals and MCNB "knowingly and intentionally concealed MCNB's loans to the Clarks and MCNB's secured position with respect to the Clarks' collateral in order to defraud NTPCA" and that the concealment was a material misrepresentation upon which NTPCA relied.

The Supreme Court has held that "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d (1986). Thus, where state law requires proof by clear and convincing evidence, "we will review the grant of summary judgment . . . in light of that standard." Applied Genetics Int'l, Inc., v. First Affiliated Sec., Inc., 912 F.2d 1238, 1243 (10th Cir. 1990). We find that there is adequate evidence in the record to create a genuine issue of material fact as to whether MCNB sought to defraud NTPCA, even under the clear and convincing evidentiary standard.

As explained above, NTPCA has put forth evidence showing that MCNB periodically released its financing statements. Moreover, there is strong circumstantial evidence to suggest that MCNB engaged in this practice in an effort to hide its lending relationship with the Clarks. A fact finder could find that, by terminating its financing statements, MCNB implicitly represented to NTPCA that it did not have security interests in the Clarks' assets. Moreover, representations as to whether a debtor has given security interests in his or her assets to other creditors are clearly material to lending institutions. The importance of representations of this nature is illustrated by the fact that NTPCA immediately requested that Rowland Clark have MCNB release the one financing statement it found on file at the clerk's office in the course of its lien searches.

In addition, we find that there is sufficient evidence of reliance and injury on the part of NTPCA for this case to survive summary judgment. Although MCNB did not directly cause the Clarks to default on the loan to NTPCA, there is evidence that NTPCA was injured by MCNB's actions in at least two ways. First, NTPCA allowed a UCC-1 financing statement that it filed in 1988 covering the Clarks' livestock to lapse in 1993.[17] On this evidence, a fact finder could

---

[17]Although NTPCA filed a financing statement on January 8, 1993, this document does not meet the requirements set forth in Okla. Stat. Ann. tit. 12A, § 9-403(3) in order to qualify as a continuation of the 1988 filing. NTPCA therefore cannot claim priority in the Clarks' livestock relating back to 1988.

conclude that NTPCA would not have allowed the 1988 financing statement to lapse if it had known that there were other parties who held security interests in the Clarks' cattle that were subsequent to 1988 but prior to 1993. In the alternative, a fact finder could also conclude that, had NTPCA known of MCNB's lending relationship with the Clarks and its security interest in the Clarks' cattle, NTPCA would not have entered into the November 3, 1994 loan agreement with the Clarks due to the risk that the loan would be undersecured. In short, although MCNB did not directly cause the default, a fact finder could find that MCNB's actions precluded NTPCA from protecting itself against default, either by ensuring that it had a superior priority interest in the Clarks' livestock or by refusing to enter into a lending relationship with an undersecured party. In conclusion, we find that NTPCA has put forth sufficient evidence to create a genuine issue of material fact as to whether MCNB sought to defraud NTPCA.

Turning to NTPCA's fraud claim as it pertains to the Individuals, we find that NTPCA has presented sufficient evidence to create a genuine issue of material fact that Wyrick also sought to defraud NTPCA. NTPCA provides evidence that Wyrick was the President and CEO of MCNB at the relevant times and that he was primarily responsible for handling MCNB's loans to the Clarks. In addition, Wyrick, on behalf of MCNB, executed the loan and security agreements that the Clarks entered into with MCNB. Based on this evidence, it

appears that Wyrick would have known of the fact that MCNB's financing statements were being released at certain times, perhaps in an effort to avoid detection by NTPCA of MCNB's security interests.

We find, however, that NTPCA has not alleged sufficient facts to implicate Rogers and Fuller in the fraud claim. At one point, NTPCA contends that Rogers and Fuller "worked under Wyrick," but makes no effort to explain how this fact necessitates the conclusion that Rogers and Fuller also participated in the fraud. In addition, although the record reflects that, on September 26, 1990, Rogers authorized the termination of the financing statements filed on September 28, 1989 and July 2, 1990, we find that this evidence is also insufficient to show that Rogers intended to defraud NTPCA. This is because NTPCA does not explain the role that Rogers played with respect to MCNB's lending relationship with the Clarks. Rogers could have simply been carrying out a clerical duty when he took these actions. For the above reasons, we find that NTPCA has shown that a genuine issue of material fact exists as to whether Wyrick defrauded NTPCA, but not as to whether Fuller or Rogers did so.

## C. Civil Conspiracy Claim

NTPCA contended in its complaint that the Clarks, MCNB, and the Individuals engaged in a civil conspiracy to "commit fraud upon NTPCA by filing and terminating UCC-1 financing statements with the intent to misrepresent the

actual financial condition of the Clarks and the secured position of MCNB with respect to the Clarks' collateral."

Under Oklahoma law,

> [t]o constitute a conspiracy, there must be a meeting of the minds on the course of action, coupled with an intent to commit the fraudulent act which results in the injury. The agreement is a matter of inference from the facts and circumstances of the alleged conspirators. The question is whether the circumstances, considered as a whole, show that the parties united to accomplish the fraudulent scheme.

Shadid v. Monsour, 746 P.2d 685, 689 (Okla. Ct. App. 1987) (citations omitted).

The Oklahoma Supreme Court has further explained:

> [T]o make out a prima facie case of conspiracy, the evidence must be (1) clear and convincing and (2) such evidence must do more than raise suspicion–it must lead to belief. The rules of law set forth above also provide that disconnected circumstances, any of which, or all of which, are just as consistent with lawful purposes as with unlawful purposes, are insufficient to establish a conspiracy.

Dill v. Rader, 583 P.2d 496, 499 (Okla. 1978) (emphasis omitted). Thus, as was the case in our analysis of the fraud claim, we must review the summary judgment issue bearing in mind the heightened evidentiary standard for a civil conspiracy claim under Oklahoma law.

In support of its argument that summary judgment with respect to this claim was improper, NTPCA points to the evidence that MCNB terminated its financing statements one or two days before NTPCA conducted each of its lien searches. NTPCA also argues that MCNB must have learned of these searches from

Rowland Clark because NTPCA informed him ahead of time as to when it would be making lien searches. We find that the evidence is sufficient to create a genuine issue of fact concerning the question of whether MCNB and Rowland Clark acted in concert in hiding MCNB's security interests in the Clarks' cattle from NTPCA. We also conclude that there is sufficient evidence to implicate Wyrick in the conspiracy, given his role as the loan officer in charge of the Clarks' loans,[18] but not to implicate Rogers or Fuller.

### D.    Punitive Damages

NTPCA claims that the district court erred when it concluded that there was no genuine issue of material fact with respect to NTPCA's request for punitive damages associated with the fraud and conspiracy claims. Under Oklahoma law, punitive damages are governed by Okla. Stat. Ann. tit. 23, § 9.1. Section 9.1 provides that a fact finder may award damages in an action for the breach of an obligation not arising from contract provided certain showings are made. Punitive damages may be awarded where fraud and civil conspiracy to defraud are

---

[18]Citing Dill v. Rader, 583 P.2d at 499, the Individuals suggest that there can be no conspiracy in this case because these events are merely disconnected circumstances which are just as consistent with a lawful purpose as with an unlawful undertaking. While releasing financing statements certainly is not an illegal activity, we cannot conclude that the pattern of actions taken by MCNB and Wyrick in this case is just as consistent with a lawful purpose as an unlawful one. Indeed, Defendants do not articulate any lawful justification for their actions.

shown.  See, e.g., LeFlore v. Reflections of Tulsa, Inc., 708 P.2d 1068, 1078 (Okla. 1985) (fraud); Powell v. Spence, 35 P.2d 925, 926 (Okla. 1934) (civil conspiracy to defraud).

By way of argument in its brief on appeal, NTPCA "incorporates and restates its argument in its Seventh Issue presented."  However, NTPCA obviously meant to refer to the "Third Issue" presented, which dealt with the underlying claims of fraud and conspiracy upon which the punitive damages claim is predicated.  MCNB understood this reference and it similarly referred to its arguments on the underlying fraud and conspiracy claims.  The punitive damages claim and the underlying fraud and conspiracy claims deal with very similar facts and they all require proof by clear and convincing evidence.  The district court obviously treated them together and did not attempt a separate analysis as to the punitive damages aspect of the fraud and conspiracy claims.  Thus, although this court ordinarily deems issues argued by incorporation by reference to have been waived, see Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 625 (10th Cir. 1998), in this case we determine that NTPCA adequately raised the punitive damages issue by reference to its argument on the underlying issues of the fraud and conspiracy claims.  Because we are reversing and remanding summary judgment for Defendants on those claims, we similarly reverse and remand on the punitive damages issue.

### E. Fraudulent Transfer Claim

NTPCA contends that the trial court erred when it granted summary judgment, sua sponte, against it on NTPCA's claim that MCNB violated the Oklahoma Uniform Fraudulent Transfer Act (the "Act"). The Act provides, in pertinent part: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor . . . ." Okla. Stat. Ann. tit. 24, § 116. Where a fraudulent transfer has occurred, a creditor may avoid "the transfer to the extent necessary to satisfy the creditor's claim." Okla. Stat. Ann. tit. 24, §119. NTPCA alleged in its complaint that MCNB violated the Act when it entered into a $200,000 loan agreement with the Clarks on November 2, 1995.

The entry of summary judgment sua sponte is warranted only when the following conditions are met: (1) there is no dispute of material fact; and (2) the losing party has had an adequate opportunity to address the issues involved, including an adequate time to develop any facts necessary to oppose summary judgment. See David v. City & County of Denver, 101 F.3d 1344, 1359 (10th Cir. 1996).

MCNB concedes that it did not specifically argue that the fraudulent transfer claim should be dismissed in its Motion for Summary Judgment or supporting brief. The record reflects that MCNB did state in its Motion for Summary Judgment that "liens granted to MCNB by the Clarks were made with adequate consideration and were not made with the intent to hinder, delay or defraud NTPCA." MCNB argues that we should affirm the grant of summary judgment to it because NTPCA addressed the issue in its Response in Opposition to the Motion for Summary Judgment. In its Response, NTPCA disputed MCNB's assertion that the liens were not granted with the intent to hinder, delay or defraud NTPCA by stating that the question of whether "the lien and mortgages granted by the Clarks in connection with a purported November 2, 1995 loan . . . was made without adequate consideration and with the intent to hinder, delay or defraud NTPCA, a creditor of the Clarks" is a disputed fact. NTPCA also directed the district court's attention to evidence set forth in NTPCA's Response to the Individuals' motion for summary judgment as support for this proposition.

We need not determine whether NTPCA had an adequate opportunity to address the issue in its Response brief, because our review of the record leads us to the conclusion that there are genuine issues of material fact in connection NTPCA's fraudulent transfer claim. The record reflects that the Clarks entered into the $200,000 loan agreement with MCNB on November 2,

1995–approximately two weeks after the Clarks had defaulted on the NTPCA loan. Moreover, Wyrick conceded in his deposition that, at the time MCNB and the Clarks entered into that loan agreement, he was aware that the Clarks were in default on the NTPCA loan. In addition, the Clarks pledged assets in connection with this loan that had not been pledged in connection with MCNB and the Clarks' prior loan agreement. These assets were equipment and real estate owned by the Clarks. We find that this evidence is sufficient to establish a genuine issue of material fact as to whether the Clarks entered into the November 2, 1995 loan with MCNB in order to avoid NTPCA's claim against his assets and was therefore an obligation incurred by the Clarks with the intent to hinder NTPCA's attempts to recover the amount remaining due on the Note. Thus, we find that the district court improperly granted summary judgment on the fraudulent transfer claim.

## II.   Attorney's Fees

In a diversity case, the matter of attorney's fees is a substantive legal issue and is therefore controlled by state law. Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency, 174 F.3d 1115, 1118 (10th Cir. 1999). "Although generally we review a district court's award of attorneys' fees for an abuse of discretion, we review its application of the legal principles underlying the award de novo." Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 765 (10th Cir. 1997).

**A. Denial of Attorney's Fees to the Individuals (No. 98-7140)**

The Individuals sought attorney's fees pursuant to Okla. Stat. Ann. tit. 42, § 176. Section 176 provides: "In an action brought to enforce any lien the party for whom judgment is rendered shall be entitled to recover a reasonable attorney's fee, to be fixed by the court, which shall be taxed as costs in the action." The district court denied the Individuals' motion for attorney's fees, reasoning that the Individuals were not entitled to fees because they were defending against claims of fraud and civil conspiracy to defraud–not a lien priority claim.

On appeal, the Individuals argue that the district court erred in concluding that they are not entitled to fees. The Individuals emphasize that they are entitled to attorney's fees under the plain language of § 176 because NTPCA's fraud and conspiracy claims against the Individuals were entirely derivative of its lien priority claim against MCNB. Citing Roofing & Sheet Metal Supply Co. v. Golzar-Nejad Khalil, Inc., 925 P.2d 55 (Okla. 1996) and Sandpiper N. Apartments, Ltd. v. American Nat'l Bank & Trust Co., 680 P.2d 983 (Okla. 1984), the Individuals further contend that the Oklahoma Supreme Court has not foreclosed such an interpretation of § 176 because it has upheld the award of attorney's fees in cases where the parties were not actually competing lienholders. The Individuals also rely on an unpublished Oklahoma Court of Appeals decision, First Capital Bank v. Wright, No. 88-753 (Okla. Ct. App. Oct. 6, 1998). In

Wright, the court of appeals reviewed a case which was factually fairly similar to the present case and concluded that a party in a position similar to that of the Individuals here was entitled to attorney's fees because the fraud and civil conspiracy claims that the plaintiff had brought were "derivative from, and dependant upon, the lien foreclosure action."

Reviewing de novo, we agree with the reasoning of the district court that a party defending against fraud and civil conspiracy claims is not necessarily entitled to recover attorney's fees, even if those fraud and conspiracy claims involve the same facts as lien priority claims brought against a codefendant. We therefore affirm the district court's decision denying attorney's fees as to Rogers and Fuller. Because we reverse and remand the district court's summary judgment with respect to Wyrick, we affirm the district court's decision to deny Wyrick attorney's fees on the alternate ground that he was not entitled to attorney's fees under § 176 because he is not a party "for whom judgment was rendered."

Oklahoma follows the American rule concerning attorney's fees in tort cases, i.e., the prevailing party cannot obtain attorney's fees unless there is a showing that the opponent acted in bad faith, vexatiously or oppressively. See, e.g., York v. Fields, 846 P.2d 360, 361-62 (Okla. 1992). The Oklahoma Court of

- 36 -

Civil Appeals recently explained the principles guiding the application of the

American Rule in Oklahoma:

> The American Rule precludes the award of such fees in the absence of a specific statute allowing their recovery or a specific contract therefore between the parties with narrowly defined exceptions. Statutes authorizing prevailing party attorney fees are to be strictly applied by the court because the award of such fees is considered to have a chilling effect upon the guarantee of open access to the courts.

In re Adoption of K.M.S., 997 P.2d 856, 857 (Okla. Ct. App. 1999) (citations

omitted).

We disagree with Fuller and Rogers' view that the plain language of § 176

requires an award of attorney's fees to them. The plain language of § 176 limits

the award of attorney's fees to "action[s] brought to enforce any lien." Here,

NTPCA has asserted fraud and civil conspiracy claims against Fuller and Rogers.

These claims were not brought to enforce a lien. NTPCA's fraud and civil

conspiracy claims are premised on the theory that MCNB and the Individuals

engaged in fraud and conspiracy in an effort to hide MCNB's security interests.

Moreover, we find that the cases cited by the Individuals in support of their

argument that the Oklahoma Supreme Court has awarded attorney's fees in cases

where the prevailing party was a not a lienholder are distinguishable from the

present case. Both cases involved actions to resolve disputes arising under

Chapter 42 of the Oklahoma Statutes, which is dedicated entirely to the law of

liens. See Golzar-Nejad Khalil, 925 P.2d at 60 (allowing an award of attorney's fees under § 176 in a case where a business successfully defended against a supplier that sued to foreclose its mechanic's lien pursuant to Okla. Stat. tit. 42, §§ 141, 143); Sandpiper, 680 P.2d at 993 (finding award of attorney's fees proper under § 176 in an action brought pursuant to Okla. Stat. tit. 42, §§ 152, 152(1-3), 153, 153(1-2) to enforce a construction trust). Thus, these cases do not stand for the proposition that an award of attorney's fees is appropriate in a case involving common law fraud and conspiracy claims.

We also decline to find that Fuller and Rogers are entitled to attorney's fees based on Wright. Wright is not controlling precedent as it is an unpublished case. Moreover, Wright is distinguishable from this case. The facts of Wright are admittedly similar to those in this case, involving competing security interests between financial institutions, as well as allegations that an employee of the defendant-institution committed fraud against the plaintiff and conspired with the debtor against the plaintiff. In Wright, the Oklahoma Court of Civil Appeals affirmed the decision of the trial court to grant attorney's fees to the defendant-employee pursuant to § 176 despite the fact that the defendant-employee did not hold a competing lien. In concluding that fees were appropriate, the court emphasized that the "sole nexus between [the plaintiff's] theories of fraud, conversion, and conspiracy asserted against [the defendant-employee] was its

- 38 -

allegation [the defendant-employee], as an officer of [the defendant-institution], received and disbursed monies which were the proceeds in which it held a security interest." Based on this observation, the court further noted that "[h]ad [the plaintiff] not been attempting to enforce its lien against assets and proceeds belonging to [the defendants], it would have no claim against [the codefendant]." In contrast, in this case, NTPCA could have brought the fraud and civil conspiracy claims against the Individuals regardless of whether it chose to dispute MCNB's priority in the collateral based on the 1991 Financing Statement. In short, unlike in Wright, NTPCA's claims against the Individuals do not depend on the ultimate determination of whether MCNB or NTPCA held the superior lien in the Clarks' cattle and the proceeds from the sale of those cattle. For these reasons, we conclude that the district court did not err in denying attorney's fees to the Individuals.

### B. Grant of Attorney's Fees to MCNB

NTPCA argues that the trial court abused its discretion when it found that the civil conspiracy/fraud claims were so interrelated with the lien priority claim that MCNB was entitled to recover attorney's fees for its entire defense. NTPCA contends that, under Okla. Stat. Ann. tit. 42, § 176, MCNB is only entitled to attorney's fees in connection with its lien priority claims and is not entitled to attorney's fees for the civil conspiracy/fraud claims.

Our decision to reverse and remand the district court's grant of summary judgment to MCNB on the lien priority claim impacts the award of attorney's fees to MCNB. Because MCNB is no longer entitled to attorney's fees under § 176 as "the party for whom judgment is rendered," we vacate the award and remand the issue for further consideration upon the resolution of the lien priority claim.

## CONCLUSION

We find that the district court improperly granted summary judgment to MCNB on NTPCA's lien priority, fraud, conspiracy, punitive damages, and fraudulent transfer claims, and we reverse and remand these aspects of the judgment for further proceedings consistent with this opinion. We conclude that the district court did not err in granting summary judgment for MCNB on NTPCA's waiver and estoppel claims, and we therefore affirm the judgment with respect to those claims. We reverse and remand the district court's grant of summary judgment to Wyrick on the fraud and conspiracy claims, but affirm summary judgment in favor of Rogers and Fuller. Finally, we affirm the denial of attorney's fees to Wyrick, Rogers, and Fuller, and we vacate the order granting attorney's fees to MCNB.